HARRIET MERSELIS *v.* ISAAC H. MEAD, JOHN WARD and CORNELIUS SCHUYLER, executors of the will of CORNELIUS MERSELIS, deceased.

Executors, in several partial accounts which had been exhibited to the Orphan's Court, had accounted separately; and no objection had been made to that mode of accounting, nor any effort to make the executors answerable jointly; and there was no evidence that either of the separate accountants ever agreed to become liable for what had been received by either of the others; nor evidence that the executors assumed the uncollected securities and agreed to account to the residuary legatees for the amount of them.

*Held,* that the executors were not jointly responsible.

Partial accounts of executors exhibited and allowed by the Orphans' Court will not prevent a person interested in the estate from bringing the executors into this court for a final settlement.

As long as the estate is not finally settled, this court may direct a statement of the whole account from the beginning, and take its own measures to compel the payment of the moneys found in the hands of the executors by such final account, notwithstanding the Orphans' Court have, on partial accounts, directed the distribution of the balances thereby found to be in the hands of the executors.

The bill, filed Feb. 23, 1846, by Harriet Merselis, states, that her father, Cornelius Merselis, made his will, dated January 16, 1835, by which, after directing his debts to be paid as soon as could be done after his decease, he gave and bequeathed to his wife, Maria Merselis, all his real and personal estate for and during her widowhood; and also the sum of $3,000 at her own disposal, and, in case she should die or get married without disposing of the same, he ordered his executors to divide the same among his four daughters, Sophia, Harriet, Caty, Ann, and the heirs of his deceased son Iddo, into five equal shares; and bequeathed unto the heirs of his son Iddo, deceased, being five children, named Maria, Sophia, Cornelius, John and Highly, $2,000 in advance out of his property; and bequeathed to the complainant $500 as an outfit, to be paid one year after the decease of the testator and his wife; and bequeathed unto his four daughters, named Sophia, Harriet (the complainant), Caty and

Ann, and to his son Iddo's five children one equal share with his four daughters, making five shares, out of all the residue of his property not disposed of before. The legacies of his son Iddo's five children made to them to be paid by his executors as soon as they should arrive of full age, or whenever either of them should get married. And appointed his three sons-in-law, Isaac H. Mead, John Ward and Cornelius Schuyler, executors of his said will. That the testator died in the fall of 1840. That the said executors proved the will on the 15th Dec. 1840.

That the executors possessed themselves of personal estate and effects of the testator to an amount greatly more than sufficient to pay the debts and specific legacies. That the said Maria, widow of the testator, surrendered and gave up her said legacy and her right to the personal estate during her widowhood, as given to her by said will, and has since died. And that the executors thereupon paid all the debts of the testator and all the specific legacies bequeathed by the said will, and received and held a large sum of money in their hands for a long space of time. And that the complainant and some of the other legatees frequently applied to the said executors and requested them to settle the said estate, and to pay to the complainant the amount of her share of the personal property in their hands; and that the complainant never could prevail on them to come to such settlement until about Feb. term, 1845, of the Orphans' Court of Passaic. That the executors, being cited to appear in said court at that term, made their report to said court, and exceptions were duly filed to their accounts rendered, and auditors were appointed to audit their accounts, who made their report to the said court at the next term thereof.

That Sophia, mentioned in the will, is the wife of the said J. H. Mead; that Caty, mentioned in the will, is the wife of the said J. Ward; and that Ann, mentioned in the will, is the wife of the said Cornelius Schuyler.

By the report of the said auditors it appeared, that the said Mead, one of the executors, had in his hands as cash collected $3,263 66; that Ward, another of the said executors had in his hands as cash $2,028 75; and that Schuyler had in his hands as cash $182 32; besides divers considerable claims not then collect-

ed, consisting of bonds, mortgages, notes and judgments. That at this time all the debts and specific legacies had been paid and satisfied by the executors. Whereupon the said Orphans' Court made an order for distribution of the said amount on hand, to the purport or effect following :

" In the matter of MEAD, WARD and SCHUYLER, executors, &c. Order for distribution.

It appearing to the court, upon the settlement of the separate accounts of the said executors this day, that there is in the hands of the said J. H. Mead a balance of $3,263 66 ; in the hands of John Ward $2,028 75 ; and in the hands of C. Schuyler $182 32 ; it is ordered that the aforesaid sums be distributed and paid by the said executors to the heirs of C. Merselis, deceased, as by his will directed, viz : One-fifth to Sophia, one-fifth to Harriet, one-fifth to Caty, one-fifth to Ann, daughters of said deceased, and one-fifth to the five children of Iddo, late son of said deceased, or to their legal representatives. May 12, 1845."

That the complainant thereupon applied to the said executors to pay to her her share of said estate as directed by the said order ; and thereupon the said executors did pay to her $135, which is all the money that has been paid to her thereon, and is the only money she has received from them or any of them since the said order.

That shortly afterwards, and on or about June 4, 1845, the said three executors and the five children of Iddo Merselis, or their legal representatives, and the complainant met together for the pursose of dividing all the bonds, mortgages, notes, &c, being the whole of the personal estate of said testator. That thereupon the said executors agreed to be charged with all the said bonds, mortgages, notes &c, being the whole personal property of the said testator not before that time divided, except a few small claims which were left by consent of all the parties in the hands of John Hopper, Esq., with directions to divide whatever should be recovered from them in five parts according to said will. And that thereupon it was agreed upon between all the said parties, that the amount with which the said executors

should be charged, including the said sum of $5,471 25 as cash, was $8,019 09, after deducting all their charges against said estate for debts, legacies, commissions and expenses, leaving for each share $1,603 81 over and above the claims left in said Hopper's hands, as aforesaid; from which deducting the said $135 paid to each share as aforesaid, left $1,468 81 due to each share as aforesaid. But out of complainant's share it was agreed should be deducted a small note of $17, and $100 for a negro, which left $1,351 43 due the complainant from the said executors on the 26th May, 1845.

That the said executors thereupon proceeded to settle, and pay to the five children of Iddo, or their legal representatives, the amount so fixed and agreed upon as due to them; and did thereupon settle with them and pay them the whole amount due them under said agreement. That, after the said children of Iddo had been settled with, the complainant called upon the said executors to settle with her. That thereupon the said executors adjourned, stating that they had not time to settle further on that day. That after waiting a reasonable time she notified the said executors to meet and settle her account and claim. That thereupon they met once or twice, but did not and would not settle and pay the complainant according to said agreement; and she has never been able to get payment of the sum so agreed to be due to her; and it never has been paid to her. That the complainant, when the executors were all present, stated to them that, if they had not the money to pay her, she would take a bond and mortgage on good property for the amount so due her, and give time for the payment thereof, leaving said sum at interest. That thereupon the executors, or one of them, promised to give her such bond and mortgage; but she has not been able to get such bond and mortgage, or any security for the said sum due her.

The bill states, that, among other pretences, the executors pretend that in as much as they filed separate accounts they are not jointly responsible to the complainant, but only each for the amount so received by him, after deducting the amount due to his wife for her share of the estate: whereas the complainant charges, that the executors have jointly undertaken the said

trust, and have each received considerable sums of money and have handed over such sums to the other executor or executors; and that the said settlement so made by the said executors with the complainant was a joint and not a several settlement; and that they jointly and severally agreed to pay her the said amount so agreed to be due her, with legal interest on the same from said May 26, 1845; and that as such executors they had no right to retain in their hands the amount so due to their respective wives and leave the complainant unpaid.

The bill prays, that the executors may be decreed to pay the complainant the said sum of $1,351 43, with interest from May 26, 1845, out of their own estate; and that, if it shall appear that no such agreement and account has been made and taken, or that for any reason they shall not be held liable according to such accounting, then that they pay her the amount so ordered by the said Orphan's Court to be paid to her, with interest thereon; and that they account to her for the residue of the personal estate of said testator which was not embraced and included in the account taken by the said auditors on which the said order of distribution was made; and that they account for the amount so found due to the complainant; and be decreed to pay to her the amount which on such accounting shall be found due to her; and for such other and further relief &c. And she tenders herself ready to give a refunding bond.

The executors answered separately.

John Ward, in his answer, after admitting the will and probate as stated in the bill, denies that he and the other executors jointly possessed themselves of the personal estate to a large amount, and jointly undertook to perform the duties of executors, and jointly proceeded to dispose of the property and collect the debts, and out of the moneys jointly to pay legacies and debts of the testator; or that he managed any assets, or paid any legacies, except as in his answer after set forth. He says that, some time before the death of testator, the defendant Mead had become the general agent of the testator, with the approbation of the complainant, and had managed his affairs for him, and had

thus become much better acquainted with the situation of his property and the character and condition of the debts due to him than either of the other executors. That as said Mead was more conversant with the business of the testator than either of the other executors, though they all proved the will, yet it was understood between them, with the concurrence of the complainant, that the execution of the will should principally devolve on said Mead; and Mead, thereupon, from the beginning took the burthen thereof mainly upon himself, and possessed himself of a large bulk of the estate, and collected debts, and has paid large sums of money on account of the estate in debts and legacies.

He admits that all the executors were cited to render their acceptances before the Orphan's Court of Passaic, in October term, 1844, and that they exhibited their accounts before said court; but he says that each executor accounted separately for the amounts he had received and expended; but he denies that he ever refused to come to an account of the moneys which had come to his hands; or that those were the first accounts rendered by the executors. He says that on the 4th October, 1843, each of the executors rendered a separate account, which was filed with the surrogate, to which no exceptions were then taken; and that each of the accounts afterwards rendered under said citation commenced from the foot of each accountant's previous account.

He admits that exceptions were subsequently filed to all the accounts by and in behalf of the children of Iddo Merselis; but says that no exception was made on the ground that the executors had accounted separately; nor was there any pretense made before the Orphan's Court, or before the auditors who re-stated those accounts, that the executors, or any two of them should be jointly chargeable for the whole estate; or that any one of them should be charged for more than had actually come to his hands.

He admits that the said accounts and exceptions were referred to auditors; and says that the auditors examined both sets of the accounts, and re-stated the same separately for each executor, and reported them thus re-stated to the Orphan's Court for approval; and that the said court on the 12th May, 1845, approved

the separate accounts as re-stated, and decreed that the same should be allowed.

He says that in those accounts Mead was charged with the whole inventory, and was credited with such items thereof as had come through his hands into the possession of this defendant, and this defendant was charged therewith.

He denies that he has possession or intermedled with any part of the estate except as appears in his said accounts as re-stated by the auditors ; or that he has received sums of money belonging to the estate and handed them over to either of the other executors ; or that he has in any way intermingled his accounts with those of either of the other executors ; or that he has in any way made himself liable for the moneys and assets of the estate which have passed into the possession of the other executors or either of them ; and insists that he is accountable only for the balance reported against him by the auditors.

He admits that the Auditors reported a balance in Mead's hands of $3263,66 after deducting his commissions ; and a balance in the hands of this defendant of $2020,75 after deducting his commissions ; and a balance in Schuyler's hands of $182,32 after deducting his commissions ; and admits that Mead was credited in his accounts with various assets that had been charged in the inventory and which, at the said time of accounting remained uncollected ; and that the amount to be distributed andor the will will be increased, over the above stated balances, by the amounts which have been and may be collected from those assets ; but he says that many of those claims are doubtful and many others of them worthless.

He admits that the Orphan's court, on the same day on which they decreed the allowance of the separate accounts of the executors as aforesaid, after reciting the balance in the hands of each executor, also ordered that the said sums be distributed and paid as by the said will is directed.

He says that he cannot with certainty answer how much the complainant has received out of the estate since the said order of distribution was made ; but he denies that he has paid her any thing, or contributed any thing towards any payments which she may have received from either of the other executors.

He admits that after the said order of distribution was made, and at the time for that purpose stated in the bill, all the parties interested in the estate went together and examined into the nature and character of the bonds and other assets and securities that had been credited in the account of Mead remaining uncollected and lying in the hands of J. Hopper, Esq., for the purpose of determining on the best disposition to be made of them ; but he denies that he then or at any other time agreed to be charged, either separately, or jointly with his co-executors, or either of them, with the said bonds, mortgages or other securities, or with any of them, or any part thereof ; or that he assumed any liability on account of the same, or agreed that the balance reported against him by the auditors should in any wise be increased by those assets or in any other manner ; or that he would be liable for or pay over to any of the parties interested any more money than the surplus of the amounts so decreed against him after deducting therefrom the distributive share coming to his wife, Caty.

He denies that any such account as charged in the bill was stated between the executors on the one part and the complainant or any other persons or person on the other ; or that the executors agreed to be charged with the sum of $8019,09, or with any sum of money other than as they are charged in the accounts as they passed the Orphan's court ; or that any settlement was made between the executors and the complainant showing that there was a balance of $1468,81 coming to the complainant for her distributive share ; or that after deducting certain amounts from it there would be due the complainant $1351,43 from the executors on the 26 May, 1845 ; or that he, either separately or jointly with the other executors or either of them, promised to pay the complainant any sum of money, or promised to give her a bond and mortgage, or any other security ; or that he has done any act or entered into any engagement that can make him liable to pay the amount claimed by the complainant, or to respond jointly with the other defendants, or either of them, for the moneys and assets of the estate which have fallen into their or either of their hands ; or that he can be compelled to assume the payment of any of the bonds, &c. which are still uncollected.

He says that, the representatives of Iddo Marselis, legatees named in the will, being minor children, and on account of their situation, in his opinion entitled to priority in payment, he, about June 4, 1845, paid to them and those representing them $1488,75, out of the balance reported by the auditors as aforesaid to be in his hands; thereby leaving in his hands only $560 on account of the distributive share coming to his wife; but he denies that such payment was made on the basis of any settlement between the executors and the legatees or persons interested in the residue of the estate, or upon any assumption on his part of the uncollected assets, or of any liability on account of moneys in the hands of either of the other executors; but that the said advance was made by him because he thought he would be better able than the said children could be to reimburse himself out of the uncollected assets.

He says that he became a purchaser of some of the personal estate of the testator, to the amount of $22,17, with which amount he has been charged in his said account. That a part of the inventory consisted of two judgments obtained by the testator against one John Marinus, which, with interest amounted to $1458,15; that the collection of those judgments was passed over by Mead to this defendant, and Mead was credited therewith in his account and this defendant was charged with them. That, considering the claim to be quite doubtful, this defendant negotiated with Marinus for further security; and, upon payment of the further sum of $461, he obtained, for the benefit of the estate, the assignment of a bond and mortgage of one Jarvis Grennel for the payment of $1850, or thereabouts, which is duly charged against him in his accounts. That he gave his individual note for the said $461, payable some time after date; and, having no moneys of the estate in his hands, he applied to Mead and received from him the said $461, with which he paid his note; with which sum this defendant is charged and said Mead is credited in the aforesaid accounts.

He denies that he has received any other assets or moneys of the estate from Mead or Schuyler.

He admits that he afterwards received on two occasions, from the owner of the equity of redemption of the premises mortgaged

to secure the payment of the said Grennel bond $111 of interest on said bond and mortgage; and that he has received payment of $28,20 from one·Walker, the amount of a judgment recovered by the testator against him and not inventoried; and that he has twice received the rent of a house in Patterson belonging to the estate, which had been in his charge during the life of the testator, amounting together to $101; which said sums are charged against him in his aforesaid accounts; and he says that he has not received any other moneys belonging to the estate, nor taken charge of any other property or effects of the estate, nor intermeddled with any of the claims that remained uncollected at the time the accounts of the executors were rendered as aforesaid. ·

He denies that he has been unwilling to have the accounts of the estate settled and closed; or that he has deferred the same for want of time, or in any way delayed the same; but sáys that he has always been desirous that the legatees and persons interested should receive the moneys due them, respectively, and that for that porpose, after the said decree for distribution was made, he offered to his co-executors that, if they would assign to him individually a bond and mortgage belonging to the estate and remaining uncollected, given by one Hiram Gelal, for $1000 and interest, he would advance the amount due on the same, first deducting the balance due to his wife over and above the amount in his hands, that the same might be divided among the others according to the will; and that Mead was willing to accept the proposal, but that Schuyler objected to it and refused to execute or to sanction such proposed assumption.

He submits that he is not bound to pay over to the complainant or to any other person, the amount in his hands to which his wife is entitled, it being less than her distributive share; but that he has a right to retain the same towards the payment of her share and that the complainant and others interested in the distribution of the estate must look to Mead for the payment of the moneys reported·by the auditors to be in his hands; and that the effort on the part of the complainant to charge the executors jointly, and to make this defendant personally liable for more moneys and assets than have come to his hands is unjust.

Mead, in his answer, admits that the executors, or some of them, took possession of all the personal effects and estate, as executors, and that the said estate and effects were more than sufficient to pay the debts and specific legacies ; and that the executors collected divers sums of money ; and that the widow surrendered and gave up the legacy bequeathed to her and also her right to the personal estate during her widowhood, except a certain portion of said personal estate, amounting in value to $903 26, which was taken by her for the use of the family ; and that she has since died ; and that, so far as he is informed and believes, all the specific legacies have been paid ; but that certain debts, amounting in all to about $380, remain unpaid.

He says that considerable sums of money have come to the hands of these executors from time to time ; but that such sums as came to his hands have been from time to time appropriated to the payment of debts or legacies, without being retained in his hands an unreasonable time.

He admits that all the executors, not having settled the estate, were cited before the Orphans' Court, and that they rendered separate accounts ; and that exceptions were filed and auditors appointed to audit as well the separate accounts as all other accounts theretofore filed by the executors. And that the auditors examined said accounts, and reported to the Orphans' Court. But he denies that by the said report it appears that he had, at the date of said report, in his hands as cash, $3,263 66, though he admits and states, that the said sum is the balance appearing against him by said report ; but that therein a large amount of bonds, notes, book accounts and judgments are charged against him, some of which have never been collected ; and the whole inventory is therein charged against him ; on the sale of which personal property certain losses have unavoidably occurred which are not therein allowed to him ; and that, in and by the said report, the moneys stated to have been actually received by him compose a small proportion of the whole amount charged against him ; and that said bonds, notes, book accounts, judgments and personal property are a part of the account on which said balance is struck ; and he prays leave to refer to the said report.

He admits the order of distribution stated in the bill; but avers that it is erroneous and unlawful, and ought not to be inforced in equity, in that it directs the distribution of moneys which had not then and have not since come to his hands, and which were not then and are not now chargeable to him, and in that the same is not in accordance with the said auditor's report on which it is manifestly based.

He says he has heard and believes that, shortly after the date of the said order of distribution, $135 was paid to the complainant; but that he has no knowledge by whom it was paid, though he believes it was by his co-executor Ward; but whether paid in pursuance of said order of distribution he has no knowledge.

He admits he has met together with his co-executors and the children of Iddo Merselis, or their representatives, for the purpose of settling said estate, about June 4, 1845; but he denies that at said meeting, or at any other time, he, as one of the executors, either severally or jointly with them, agreed to be charged with all the bonds, mortgages and notes not before that time divided, being the whole of the personal estate of the testator not before then divided, except as in the bill excepted; and that he did not at said meeting, or at any other time, either severally or jointly with his co-executors and the said devisees, agree that the said executors should be charged with $8,019 09 after deducting all their charges against said estate for debts, legacies, commissions and expenses and including the said sum of $5,471 25 as cash. On the contrary, he avers that he did not then, nor has he at any time made any agreement with the parties aforesaid, or with any other person or persons, that could bind him to pay and made good out of his individual estate any losses that might be incurred on any of the said bonds, mortgages, notes, judgments or accounts, or to pay any debts that might still remain due from said estate, or to release or abandon any just and lawful claim he then had or might thereafter have against said estate for or on any account whatever.

He denies that $1,341 43, or any other definite sum, has been agreed upon by him as a fixed balance due the complainant; and avers that the pretended facts stated in the bill, and which are the basis of the calculation which results in the said balance, are

(as they have been hereinbefore) denied ; and that the complainant has no claim except for one-fifth of such residue as may remain after all the residue of said estate shall be converted into money and all debts, costs, expenses and liabilities shall be paid and discharged.

He admits that, since the date of the said decree of the Orphans' Court, $1,300, as near as he can recollect the amount, has been paid or secured to the children of Iddo Merselis ; but he denies that by the said payment any agreement was recognized by which the defendants, or any or either of them, was bound to answer for any part of the assets of the estate out of their own personal property, or by which any bonds, judgments, notes or accounts then remaining uncollected should be charged to the defendants, or either of them, as cash, or by which any certain or fixed sum was ascertained as the amount due the complainant as residuary legatee ; and avers that the said payment or security for payment was made and given in good faith, and under the belief that the same would not exceed the amount that would fall to the share of the said minor children on the final settlement of the said estate ; and further, that such payment and security were made and given with the knowledge and concurrence of the complainant.

He admits that, after said payment or security to Iddo's children, the complainant called on these defendants to settle with her for her share, and that the said claim as stated in the complainant's bill has not been paid, to the best of this defendant's knowledge and belief ; and as to the allegations of the complainant respecting an offer made by her to take a bond and mortgage on good property for the amount in her bill alleged to be due to her, as said offer is stated in said bill, he says he has no knowledge of any promise by the executors, or either of them, to give the complainant such bond and mortgage ; though he admits that, about the time in the bill stated as the time of said offer and promise, the complainant offered to take a mortgage on certain property of this defendant, by her designated, for an amount which this defendant does not recollect, but exceeding the amount by her claimed in her bill, and comprising as well a claim made by her under the pretended agreement in her bill set forth as cer-

36

tain other pretended claims made by her against this defendant individually and not as executor ; but that this defendant refused to comply with said offer, and offered, on his part, to secure to her by mortgage an amount which he cannot now recollect, but less than the sum then claimed by the complainant, and less than the amount claimed by her in her bill ; but that the complainant refused to accept his said offer, and neither party was bound to abide by the offers then made, no agreement having been concluded between them.

He admits that Sophia is his wife ; and that Caty is the wife of Ward; and that Ann is the wife of Schuyler.

The defendant Schuyler, in his answer, denies that he took into his possession any of the personal estate; and says that Ward and Mead took into their possession all the personal estate, and the whole burden of the settlement of the estate.

He admits the citation of the executors before the Orphans' Court, and the proceedings thereon as stated in the bill ; and says that, though he was charged in the report of the auditors and in the decree with $182 32 as cash, to which he did not object, yet that this sum was the amount of a bill of articles bought by him at the vendue, and which was left unpaid by him to be deducted from his wife's distributive share.

He says that, on or about June 4, 1845, Mead, Ward and himself and the five children of Iddo, or their representatives, and the complainant met together for the purpose of dividing all the bonds, mortgages, notes &c., being the whole of the personal estate, and settling the estate. That thereupon an account was made out of the whole estate, except a few claims which, by consent of all parties, were to be left in the hands of John Hopper with directions to divide whatever should be recovered from them in five parts according to the will ; and that on such accounting this defendant was to be charged with the said $182 32, being the amount charged against him, on account of his wife's share ; and that the whole of the personal estate, except the amount so left in Hopper's hands, after deducting all charges against said estate for debts, legacies, commissions and expenses, was $8,019 09, leaving for each share $1,603 81 over and

above the amount in Hopper's hands. But, inasmuch as this defendant had not in his possession any of the moneys of the estate, the persons entitled to distributive shares were to be paid by Mead and Ward, they having the whole estate in their hands.

That upon making this statement, and all parties agreeing to it, Mead and Ward thereupon forthwith proceeded to settle with Iddo's children, or their representatives, and paid them their share of the estate, being the amount so fixed upon and agreed to as their share.

That, after Iddo's children had been settled with, the complainant demanded that she should be paid; but that they then adjourned; and that afterwards they had another meeting, all being present except Iddo's children and their representatives; and this defendant believes that the complainant has never been paid the amount due her for her share; but he insists that, as he never had the estate in his hands, he ought not to be charged therewith, but that the same ought to be paid by Mead and Ward, who held all the moneys and assets in their hands.

Testimony was taken; and the cause was heard on the pleadings and proofs.

*A. S. Pennington* for the complainant.

*John Hopper* for the defendant Ward.

*D. Barkalow* for the defendant Mead. He cited 1 *Green's Ch.* 490; 2 *Ib.* 44, 54, 231.

THE CHANCELLOR. That part of the prayer of the bill which is founded on an alleged agreement by the executors to become jointly responsible to the complainant for a certain amount, including several bonds and mortgages and other securities not yet collected, and which prays that the executors jointly may be decreed to pay to the complainant that certain amount, cannot, upon the proofs in the case, be granted. The executors, in the several partial accounts which had been exhibited to the Or-

phans' Court and allowed, had accounted separately; and no objection was made to that mode of accounting, nor any effort to make the executors answerable jointly; and there is no evidence to show that either of the separate accountants ever agreed to become liable for what had been received by either of the others; nor any evidence sufficient to show that the executors assumed the uncollected securities and agreed to account to the residuary legatees for the amount of them.

By the last separate accounts of the executors settled before the Orphans' Court there was found to be in the hands of the executor Mead, $————; and in the hands of the executor Ward, $————; and in the hands of the executor Schuyler, $———— ; and by the order of that court the executors were ordered to distribute the amounts in their hands.

Another part of the prayer of the bill is, that if the executors cannot be held liable on the agreement set out in the bill, (the alleged agreement on which the first part of the prayer is founded) then that the executors may be decreed to pay to the complainant the amount so ordered by the Orphans' Court to be paid to her, with interest thereon, and that they account for the residue of the personal estate which was not included in the accounts allowed by the Orphans' Court; and that they may be decreed to pay to the complainant the amount which on such accounting shall be found due to her; and for such further and other relief &c.

No final account has ever been settled by the executors in the Orphans' Court. The partial accounts which have been exhibited to and allowed by the Orphans' Court cannot prevent the complainant's bringing the executors into this court for a final settlement.

This is as far as it is necessary to go at present. It will be referred to a Master to take and state the accounts of the executors; and all further equity and directions are reserved until the coming in of the Master's report.

It was argued on the part of the defendant Mead, that, inasmuch as the Orphans' Court had made an order for the distribution of the several amounts found in the hands of the respective executors by the partial accounts exhibited to and allowed by the

Orphans' Court, the complainant could ask no relief in this court in reference to those amounts ; for that the power of the Orphans' Court to compel the distribution was ample.

The question here presented is, whether, when on partial settlements by executors the Orphans' Court order distribution of the moneys then in hand, and they are not distributed, and the complainant comes into this court for a final settlement, and the estate is finally settled here, this court cannot act in reference to the balances struck against the executors by the Orphans' Court on the partial settlements, and adopt its own measures to compel their payment.

It seems to me that, as long as the estate is not finally settled, this court may direct a statement of the whole account from the beginning, and take its own measures to compel the payment of the moneys found in the hands of the executors by such account, notwithstanding the Orphans' Court have, on partial accounts, directed the distribution of the balances thereby found to be in the hands of the executors.

It will be referred to a Master to take and state the accounts of the executors ; and all further equity and directions are reserved until the coming in of the Master's report.

Order accordingly.